IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| DANAH GRIFFIN, o/b/o D.I., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 15 C 2512 |
| | ) | |
| CAROLYN COLVIN, | ) | Judge Virginia M. Kendall |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Danah Griffin on behalf of her son D.I. seeks review of the Social Security Administration's denial of her application for Supplemental Social Income benefits. On September 2, 2014, an Administrative Law Judge ("ALJ") issued a decision denying her application because D.I. did not qualify as disabled under federal law. The Social Security Appeals Council denied Griffin's request for review of the ALJ's opinion and the parties subsequently filed cross-motions for summary judgment. Griffin asserts three challenges to the ALJ's decision in her motion: first, that the ALJ erred in holding that D.I. did not meet the criteria under Listing 112.05 for an intellectual disability; second, she objects to the ALJ's determination that D.I. does not qualify under Listing 112.11 for Attention Deficit Hyperactivity Disorder; and third, the ALJ made an improper credibility finding regarding Griffin's testimony. For the following reasons, the Court denies Griffin's motion, grants the Commissioner's motion, and finds that the ALJ did not err by holding that D.I. is not disabled. (Dkt. Nos. 9, 11.)

# BACKGROUND

## I.     Procedural History

Griffin filed for an application for Child's Supplemental Security Income ("SSI") on behalf of D.I. on December 9, 2011.  (R. at 103.)   The Social Security Administration denied D.I.'s initial application and his request upon reconsideration.  (R. at 105-13.)  Griffin requested a hearing by an Administrative Law Judge ("ALJ") on November 30, 2012 that was granted and the hearing held on June 24, 2014.  (R. at 114-41.)  The ALJ issued a decision on September 2, 2014 denying Griffin's SSI application.  (R. at 25-47.)  On appeal, the Social Security Appeals Counsel denied Griffin's request for review and held that the ALJ's decision was final.  (R. at 1-6.)  Griffin then initiated this action and both parties moved for summary judgment.  (Dkt. Nos. 9, 11.)

## II.     Medical History of D.I.

D.I. was born on November 8, 2002 and has been diagnosed with attention deficit hyperactivity disorder ("ADHD").  (R. at 103.)  On July 18, 2011, he was treated by Dr. Brooke Turnock for a wound check and returned for a follow-up on October 4, 2011 with Dr. Turnock, at which time Griffin reported that D.I. was easily distracted and behind in school.  (R. at 254-61.)

D.I. met with Marsha Robinet, a licensed clinical social worker, on November 14, 2011.  (R. at 252-53.)  Griffin reported that D.I.'s performance in school had declined and brought in a completed Vanderbilt ADHD assessment form indicating that D.I. was inattentive, hyperactive, and had some impulse control.  *Id.*

On January 11, 2012, D.I. met with psychiatric advanced practice nurse Jill Degen.  (R. at 278.)  In her psychiatric review of D.I.'s symptoms, Degen noted that D.I. lacked attention to

detail, struggled with sustaining attention, did not follow directions, was forgetful, and squirmed in his seat. *Id.* She also noticed that D.I.'s appearance was appropriate, he was cooperative, had normal speech, and good eye contact. (R. at 278-79.) Griffin told Degen at the meeting that school is difficult for D.I. because he has a hard time focusing and understanding the material. (R. at 280.)

Licensed clinical psychologist Dr. Mark Langgut performed a psychological assessment of D.I. on February 9, 2012 and issued a report on February 15, 2012 with his conclusions. (R. at 264.) Dr. Langgut stated that D.I. had been taking medication for ADHD for the past week and the medication improved his ability to focus. (R. at 265.) Dr. Langgut also learned that since taking the medication D.I.'s behavior improved, he got along better with his peers and family, and he helped with chores. *Id.* The report noted that D.I. earned Ds and Fs in school and had not repeated a grade. *Id.* It further stated that D.I. has several friends and adequate social relationships. *Id.* Dr. Langgut described D.I. as cooperative and friendly with a good emotional range. (R. at 266.) He reported that D.I.'s activity level was normal and observed no abnormalities. *Id.* Upon evaluation, Dr. Langgut found that D.I.s thought processes were characterized by normal speed and average coherence. *Id.*

D.I. returned to see Degen on March 9, 2012 at which time Griffin explained that the medication was somewhat helping D.I. and seemed to stop working. (R. at 282.) Upon examination, Degen noted that D.I. had an appropriate general appearance, normal speech, adequate intellectual functioning, and was happy. (R. at 281-82.) Based on this appointment, Degen increased D.I.'s medication dosage. *Id.* She met with D.I. again on April 3, 2012 when Griffin told her that D.I. had been provided the wrong prescription. (R. at 286.) Degen again reported in her mental status examination that D.I. had an appropriate general appearance,

normal speech, adequate intellectual functioning, and was happy. (R. 284-85.) She provided Griffin the correct prescription for D.I. (R. at 286.) On July 5, 2012, D.I. saw Degen for medication management purposes. (R. at 288.) D.I. and Griffin told Degen that he was doing well and his grades had improved. *Id.* Griffin expressed concern about D.I.'s occasional headaches and Degen advised that D.I. eat more at lunch as the headaches happened in the afternoon. *Id.* Otherwise, Degen noted that D.I.'s appearance, judgment, speech, mood, and intellectual capacity were normal and unchanged. (R. at 287-288.) D.I. also met with Robinet on July 5, 2012. (R. at 290.) D.I. and Griffin told her that D.I.'s grades had improved on the medication. *Id.* D.I. expressed that he was able to focus better on the medication and that it helped him. (R. at 290-91.) Robinet played a card game with D.I. and needed to remind him about the rules of the game. (R. at 290.)

On August 8, 2012, D.I. returned to see Degen and both he and Griffin reported that he was doing well. (R. at 294.) D.I. stated that he was having difficulty sleeping and Degen suggested that Griffin monitor the issue. *Id.* The following day, D.I. visited Robinet and told her that the medication was helping him. (R. at 297.) Griffin agreed that the medication helped D.I. to focus. (R. at 296.) Both Degen and Robinet found that D.I. had an appropriate general appearance, normal speech, adequate intellectual functioning, and was happy. (R. at 293-94; 296-97.) D.I.'s next appointment was with Robinet on October 17, 2012 in which he said that he liked school, was on the football team, and had not been bullied recently. (R. at 411.) Griffin relayed to Robinet that things were going well except that D.I. still had headaches from the medication. *Id.* Robinet played a card game with D.I. and noted that he needed to be reminded to wait his turn. *Id.* Her mental status examination of D.I. remained stable. (R. at 411-12.)

School officials held a meeting with Griffin on November 20, 2012 to determine whether D.I. was eligible for an Individualized Education Program ("IEP"). (R. at 318.) At the hearing, they remarked that D.I.'s strengths were that he is polite, agreeable, succeeds in reading and writing, participates in class, follows rules, and able to do simply math. (R. at 320.) They considered that D.I. was currently repeating third grade and functioning below third grade level in all subjects. *Id.* On the Wechsler Intelligence Scale for Children, his overall cognitive functioning—also known as his IQ score—fell within the extremely low range at 59, which is the third percentile. *Id.* His Perceptual Reasoning abilities fell within the borderline range while his Verbal Comprehension, Working Memory, and Processing Speed abilities were in the extremely low range. *Id.* The IEP described D.I. as having a mild cognitive impairment as he needs more time to process directions and start tasks, sometimes completes a task differently than instructed, and requires assistance to complete much of his work. (R. at 327.) D.I.'s teacher reported that he processes slowly, math is his greatest weakness, and is not a behavior problem. (R. at 348.) Griffin described how D.I. has more will power since starting the ADHD medication but that it takes him a long time to complete homework. *Id.* The IEP recommended that D.I. receive academic services in a separate classroom for about 29% of the school week and 200 minutes per week in regular classes. (R. at 333.)

D.I. met with Lois Platt on February 23, 2013, although the medical credentials of Platt are unknown. (R. at 408.) D.I. said that he had been taking his medication. (R. at 407.) Griffin told her that D.I. was bullied at school, he suffered headaches in the afternoon, and his grades had improved. *Id.* Platt noted that D.I.'s appearance was appropriate, intellectual functioning was adequate, speech was normal, and he was happy. (R. at 406.)

D.I. entered fifth grade and on October 29, 2013 another IEP meeting was held with school officials and Griffin to review his special education needs. (R. at 351.) They found that D.I. exhibited social awareness and communicated properly to maintain positive relationships but needed to demonstrate initiative in the absence of directions and follow directions when given. (R. at 353.) He still struggled with slow processing, staying on task, and math. *Id.* D.I.'s curriculum-based assessment results showed slight improvement but were still in the low and borderline range. *Id.* The IEP suggested 1,200 minutes per week of direct services in a separate classroom amounting to 57% of his time at school. (R. at 371.)

Dr. Turnock examined D.I. at a general check-up on April 9, 2014. (R. at 398.) Griffin expressed concerns about D.I.'s weight. (R. at 400.) She stated that school was going ok for him and he enjoyed sports. *Id.* Griffin also explained that D.I. stopped taking his ADHD medication because D.I. complained about headaches and discussed trying a different medication. *Id.* Dr. Turnock prescribed D.I. a new ADHD medication: Ritalin. (R. at 403-04.) He noted that D.I. exhibited pre-hypertension and obesity but was otherwise healthy. (R. at 402-03.) D.I. returned to Dr. Turnock on May 5, 2014 to receive treatment for pink eye. (R. at 394.) Griffin told Dr. Turnock since starting Ritalin, D.I. was more active and talkative. (R. at 393.) D.I. said that the Ritalin helped him concentrate but Griffin disagreed. *Id.*

Degen saw D.I. on May 15, 2014 for a medical management appointment. (R. at 388.) Griffin and D.I. reported that Ritalin was not going well because it did not help him focus and Degen decided to increase the dosage as a result. *Id.* Her mental status examination of D.I. found him normal. (R. at 389.) D.I. returned to Robinet on May 21, 2014 for counseling. (R. at 385.) Griffin told her that D.I. had trouble staying focused and was impulsive. *Id.* D.I. said that

he had been taking his medication. (R. at 386.) Robinet found D.I. pleasant and talkative. (R. at 385.) The mental status assessment was again normal. *Id.*

On June 18, 2014, D.I. met individually with Degen, Robinet, and Dr. Turnock. (R. at 419-27.) D.I. had completed fifth grade and was promoted to sixth grade. (R. at 423.) Their mental status assessments of D.I. were normal. (R. 423-24.) D.I. stated that he was taking Ritalin. (R. at 424.) Griffin said that D.I. was doing better on the Ritalin and that she would consider increasing his dosage at his next doctor's appointment. (R. at 426.)

According to D.I.'s prescription records, his compliance with ADHD medication was inconsistent. (R. at 222-235.) He filled his prescription for a 30-day supply of generic Focalin on March 9, 2012, March 29, 2012, May 8, 2012, July 9, 2012, August 10, 2012, October 19, 2012, December 6, 2012, February 23, 2013, and April 9, 2013. *Id.* He filled his prescription for a 30-day supply of generic Ritalin on April 11, 2014, May 20, 2014, and June 26, 2014. *Id.* D.I. filled no prescription for ADHD medication from April 9, 2013 to April 11, 2014.

## LEGAL STANDARD

A reviewing court will affirm the Commissioner's final decision where it is supported by "substantial evidence" and the ALJ applied the correct legal standard. *Bates v. Colvin*, 736 F.3d 1093, 1097-98 (7th Cir. 2013) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses." *Id.* at 836-37. The ALJ's decision, however, must rest on "adequate evidence contained in the

record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). The ALJ must "build a logical bridge from the evidence to [her] conclusion, but [she] need not provide a complete written evaluation of every piece of testimony and evidence." *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). If the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," remand is required. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quotation and citation omitted).

## DISCUSSION

In order to determine whether a child qualifies as disabled under the Social Security Act ("SSA"), the Court first asks whether the child is engaging in "substantial gainful activity." 20 C.F.R. § 416.924(a). If the child is engaging in "substantial gainful activity" then his or her claim is denied. *See id.* Second, if the child does not suffer from a severe medically determinable impairment or combination of impairments, the claim is denied. *See id.* Finally, to constitute a disability the child's impairment or impairments must meet or be functionally equivalent to any of the Listings of Impairments included in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("listed impairments"). *See id.* An impairment or impairments is medically equivalent to a listed impairment "if it is at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). Specifically, the Court contemplates six domains in making this determination: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1)(i-vi). The impairment(s) must result in marked limitations in two domains or an extreme limitation in one domain in order to be "functionally equivalent" to a listed impairment. 20 C.F.R. § 416.926a(a). A limitation is marked if it "interferes seriously with your ability to independently

initiate, sustain, or complete activities." *Id.* at 416.926a(e)(2)(i). A limitation is extreme if it "interferes very seriously with your ability to independently initiate, sustain, or complete activities." *Id.* at 416.926(e)(3)(i).

The ALJ concluded that D.I., as a child, has not engaged in substantial gainful activity since Griffin filed the SSI application and has the severe impairments of a learning disorder and ADHD. (R. at 31.) She further found that D.I. does not have an impairment or combination of impairments that meets or medically equals the severity of Listing 112.02 for organic brain disorder, Listing 112.05 for intellectual disability, or Listing 112.11 for ADHD, and accordingly held that D.I. is not disabled under the SSA. *Id.* Griffin seeks review of the ALJ's decision, arguing that it is not supported by substantial evidence and contrary to the law. She claims that the ALJ erred in finding that D.I.'s impairment did not medically meet or equal Listing 112.05 or Listing 112.11. Griffin additionally asks the Court to reverse the ALJ's decision because of its credibility finding about her testimony at the hearing.

**I.       Listing 112.05**

Listing 112.05 covers children with an intellectual disability that is "[c] haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1. Listing 112.05 contains six possible criteria and if a child's impairment "satisfies the diagnostic description in the introductory paragraph and any one of the six sets of criteria, [the Court] will find that the child's impairment meets" its requirements. *Id.* Griffin argues that in its Listing 112.05 analysis, the ALJ did not give proper weight to D.I.'s IQ, which is critical evidence. Griffin quarrels with the ALJ's consideration of how D.I. can self-administer medicine, perform age-appropriate chores, get around school, make friends, and play team sports. The Commissioner asks the Court to affirm the ALJ's holding because she

reasonably determined that D.I. did not meet or medically equal the Listing 112.05. The Commissioner claims that the ALJ factored in D.I.'s IQ in its decision but properly found that D.I. did not also demonstrate deficits in adaptive functioning as a low IQ alone is not determinative in the Listing 112.05 analysis.

The ALJ's finding that D.I. did not satisfy the requirements for Listing 112.05 is supported by substantial evidence and contains no error of law. She properly acknowledged that "the intelligence testing [of D.I.] showed evidence of subaverage general intellectual functioning" and cited to D.I.'s IQ score of 59, thereby recognizing that D.I. fulfilled the second Listing 112.05 requirement by having an IQ score of 59 or less. (R. at 32.) The ALJ went on to conclude that "the record does not support a finding that the claimant has the deficits in adaptive functioning that must be established before those scores are considered," in appropriate consideration of the need to first determine whether D.I. satisfied the diagnostic description in the introductory paragraph of Listing 112.05. *Id.* In short, the ALJ applied the proper legal standard under Listing 112.05 by determining whether D.I. met one set of criteria and the diagnostic description in Listing 112.05's introductory paragraph.

The ALJ then supported its conclusion that D.I. is not deficient in adaptive functioning with substantial evidence by first incorporating its prior discussion of Listing 112.02 wherein the ALJ noted that although D.I. has faced significant academic challenges, his impairment only markedly limited his cognitive/communicative abilities because he plays team sports, made progress when medicated, demonstrates good behavior, maintains positive social relationship, self-administers medication, has normal sleep patterns and appetite, cares for his personal hygiene, and transitions at school without difficulty. *Id.* In addition to incorporating by reference her Listing 112.02 analysis, the ALJ highlighted a few specific reasons why D.I. does

not have deficits in adaptive functioning, reiterating that D.I. self-administers medication, plays team sports, has no difficulty getting around school, performs chores at home, cares for his personal hygiene, has friends his own age, and has not been diagnosed by school and treating personnel with an intellectual disability. *Id.* Griffin objects to the ALJ's determination that D.I. can self-administer medication, plays team sports, has no difficulty getting around school, can do age appropriate chores, and has friends his age; but the Court cannot "substitute our judgment for the ALJ's when considering the weight of the evidence" and Griffin "must do more than point to a different conclusion that the ALJ could have reached to demonstrate that the credibility determination was patently wrong." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010). As the ALJ's characterization of D.I.'s impairment is supported by substantial evidence, the Court will not substitute her judgment in favor of Griffin's interpretation.

Although Griffin takes issue with the fact that the ALJ directly addressed Listing 112.05 in only one footnote, "it is proper to read the ALJ's decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses[.]" *Rice v. Barnhart*, 384 F.3d 363, n.5 (7th Cir. 2004). Considering that the ALJ's summary of the record, explanation of the weight of the evidence, and analysis of the six domains is applicable to all three listed impairments addressed by the ALJ, the Court applies the ALJ's discussion of these issues to its Listing 112.05 inquiry. *See id.* The ALJ subsequently summarized relevant evidence about D.I.'s appointments with counselors, nurses, doctors, and school personnel as well as prescription history, thus properly viewing the record as a whole. *See Beardsley*, 758 F.3d at 836.

The ALJ then stated that she gave little weight to the opinions of Degen and Robinet because they are not medically acceptable sources, there was a large gap in their treatment of

11

D.I., and their opinions were based on Griffin and D.I.'s reports of his symptoms rather than personal observation. (R. at 38-39.) Under 20 C.F.R. § 416.913(a), as a licensed clinical social worker and psychiatric advanced practice nurse Robinet and Degen are not acceptable medical sources. The ALJ thus was justified in diminishing the weight of their reports in the face of evaluations from licensed psychologists who are acceptable medical sources. *See id.* In addition, the record supports the ALJ's finding that Robinet and Degen's opinions were derived from D.I. and Griffin's observations and that they did not treat him from October 2012 to May 2014. The Court accordingly will not substitute its judgment for the ALJ's when it is supported by substantial evidence and adequately discussed the issues. *See Jones*, 623 F.3d at 1162; *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded.") (citation omitted). Next, the ALJ summarized the testimony of Griffin and D.I. at the hearing and gave full credit to D.I.'s testimony but not to Griffin; as explained below, the ALJ did not err in making this credibility finding.

Lastly, the ALJ analyzed each of the six domains and determined the extent of D.I.'s limitation in each. (R. at 42-46.) She found that D.I. has a marked limitation in acquiring and using information based on his delayed academic progress that improved with medication and special education as well as his ability to play team sports, video games, and enjoy reading. (R. at 42.) Second, she held that D.I. has a less than marked limitation in attending to and completing tasks because his difficulty with attention improves significantly with medication, he was attentive at the hearing, and he made some academic progress while not medicated. (R. at 43.) Third, the ALJ determined that D.I. has a less than marked limitation in interacting and relating with others because he plays team sports, generally gets along with others, and was

respectful and cooperative at the hearing.  (R. at 44.)  Fourth, the ALJ found that D.I. has no

limitation in moving and about and manipulating objects because the record did not show any

limitation on this domain.  (R. at 45.)  Fifth, she concluded that D.I. has no limitation on the

ability to care for himself because he can self-administer medication, generally has normal sleep,

has a normal appetite, plays team sports, and can get to school without difficulty.  (R. at 46.)

Finally, the ALJ held that D.I. has a less than marked limitation in health and physical well-being

because although he is overweight, he is active and plays team sports, his weight does not cause

significant limitations, and his counseling and special education only minimally interfere with

other age appropriate functioning.  *Id.*

Overall, when viewing the record and the ALJ's decision as a whole each of these factual

determinations is supported by substantial evidence.  *See Craft v. Astrue*, 539 F.3d 668, 673 (7th

Cir. 2008).  The ALJ therefore did not err in concluding that D.I. does not qualify as disabled

under Listing 112.05 because she made no error of law, appropriately summarized the evidence,

assigned weight to the various opinions presented, and articulated logical and accurate bridges

"between the evidence and the result to afford the claimant meaningful judicial review of the

administrative findings."  *Id.* at 837.

## II.     Listing 112.11

Listing 112.11 encompasses children with ADHD that is medically documented in

findings of "1. Marked inattention;  and 2. Marked impulsiveness;  and 3. Marked

hyperactivity[.]"  20 C.F.R. Pt. 404, Subpt. P, App. 1.  A child age 3 to 18 must also demonstrate

that these symptoms result in at least two of the appropriate age-group criteria in paragraph B2 of

112.02, which are listed as:

> a. Marked impairment in age-appropriate cognitive/communicative function,
> documented by medical findings (including consideration of historical and other

information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

d. Marked difficulties in maintaining concentration, persistence, or pace.

*Id.* Griffin argues that the ALJ's consideration of Listing 112.11 was deficient because records of D.I.'s visits with a pediatrician, licensed social worker, and advanced practice nurse represent that he suffered from marked inattention, marked impulsiveness, and marked hyperactivity; however she admits that these same reports state that he was doing well at times. She further claims that D.I.'s impairments qualify as functionally equal to Listing 112.11 because his ability to attend and complete tasks is markedly limited. The Commissioner contends that the ALJ's conclusion that D.I.'s ADHD was not functionally equivalent to Listing 112.11 was reasonable because Degen and Robinet are not acceptable medical sources under the SSA and the ALJ thoroughly explained her reasoning.

The ALJ held that according to the record discussed subsequently in the opinion, when he complies with his medication, D.I. does not have a marked impairment with respect to inattention, impulsiveness, or hyperactivity. (R. at 32.) She also concluded that even when D.I. is not complying with his medication, he does not show these ADHD signs because while he has significant difficulties in attention, the evidence does not show that these difficulties are markedly severe or that he is markedly limited in the other two areas. *Id.* The ALJ noted that

she gave great weight to the two psychologists' evaluations that opined that D.I.'s impairments were not so severe as to meet or medically equal a listed impairment. *Id.*

The ALJ's discussion of Listing 112.11 is brief; however, it references later analysis of the record and the Court must read the decision as a whole. *See Rice*, 384 F.3d at n.5. As described above, the ALJ thoroughly compiled all the evidence and provided adequate analysis of it in reference to the relevant issues under Listing 112.11. She correctly considered that neither psychologist found that D.I.'s impairments meet or medically equal any listed impairment. (R. at 32.) Furthermore, her finding that D.I. did not suffer from marked impairment in attention, impulsiveness, or hyperactivity when medicated and his impulsiveness or hyperactivity did not markedly limit him even when not medicated is supported by substantial evidence. Griffin points to other evidence that she believes the ALJ ignored, but the ALJ is not required to list every piece of evidence and address its relevance. *See Rice*, 384 F.3d at 371. The ALJ therefore did not err in holding that D.I. did not meet Listing 112.11. *See, e.g., J.H.R. ex rel. Radford v. Astrue*, No. 1:07—cv—1584—DFH—DML, 2009 WL 692211 *6-7 (N.D. Ind. Mar. 13, 2009) (finding ALJ did not err in determining that claimant did not meet Listing 112.11 requirements because two doctors found he did not meet or medically equal any listing and the evidence supported that conclusion).

## III.    Credibility Determination

The ALJ decided that Griffin's testimony at the hearing was not fully credible and accorded it less weight as a result. (R. at 41.) Griffin asks the Court to find that the ALJ erred in diminishing the credibility of her testimony because her reasoning has gaps in comparison to the weight she assigned Degen and Robinet's opinions. An ALJ must comply with the requirements

of Social Security Ruling 96-7p when evaluating the credibility of statements supports a SSI application.  That Ruling dictates that:

> The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." ... The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 WL 374186, at *4 (S.S.A. July 2, 1996); *see also Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).  The ALJ gave sufficient reasons grounded in the record for her credibility determination of Griffin and it was consistent with her consideration of Degen and Robinet's input.  She noted that Griffin's testimony clashed with D.I.'s testimony about the severity of his symptoms and also with reports from D.I., Griffin, and the doctors documenting that D.I. improved with medication.  (R. at 41.)  Moreover, the ALJ factored in how Griffin testified that D.I. regularly took his medication when the prescription records indicate that his prescriptions were not consistently filled and no prescription was filled from April 2013 to April 2014.  *Id.*  Griffin testified that she was worried that the medication would cause D.I. brain damage and other side effects, but the ALJ was doubtful of this claim when Griffin did not consistently voice these concerns to Degen, Robinet, or Dr. Turnock and did not take D.I. to a mental health appointment between October 2012 and April 2014.  *Id.*  These facts relied upon by the ALJ in making the credibility determination are supported by the record.  Additionally, the ALJ's analysis of Griffin's credibility created no inconsistencies with her lessening the weight of Degen and Robinet's testimony.  The ALJ gave Degen and Robinet's opinion less weight because they are not acceptable medical sources, there was a large gap in their treatment of D.I., and they did not rely on their personal observations.  In contrast, the ALJ diminished

Griffin's testimony because it was inconsistent with other evidence. In sum, because the ALJ articulated specific reasons for giving Griffin's testimony less weight that are supported by the record and sufficiently specific to make clear that amount of weight she gave it, the ALJ did not err in finding that Griffin's testimony was not fully credible.

## **CONCLUSION**

For the reasons stated therein, the Court denies Griffin's motion for summary judgment, grants the Commissioner's motion for summary judgment, and holds that the ALJ did not err by concluding that D.I. does not qualify as disabled.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 3/10/2016